420.　If, therefore, the only cause arising from the facts alleged in the complaint is that of fraud, his right to recover was dependent upon evidence in support of such a cause of action.　But, notwithstanding the allegations before referred to, the facts alleged in the complaint, in the view taken of them, support the charge of negligence on the part of the defendants, and recovery on that ground is no departure from the alleged facts in support of it.　In Robinson v. Wheeler, 25 N. Y. 252, the plaintiff alleged that the defendant wrongfully set fire to and destroyed the woodshed.　It was held that the plaintiff could recover without showing that it was purposely done, and upon proof that the woodshed was destroyed through the negligence of the defendant; and upon that ground the recovery was sustained.　Bedford v. Terhune, 30 N. Y. 460.　The evidence warranted the recovery upon the charge of negligence of the defendants.　And the cases cited in support of the contention to the contrary have no necessary application to the facts in the present case.　The evidence in the record does not warrant the assumption made by counsel that the defendants were merely forwarders of the application for insurance in the Great Northern Insurance Company, but the conclusion fairly required is that they assumed to select that company as the one from which the policy should be obtained, and made the application accordingly.

It is also contended that, at all events, the question of negligence should have been submitted to the jury.　The court did specially submit to them the question of value of the plaintiff's property which was covered by the policy and destroyed by the fire, and directed a verdict for the amount so found by the jury.　The question of negligence is really a mixed one of law and fact, and cannot be treated as one of law only, when the evidence admits of any conflicting inference in that respect.　In the case at bar the defendants' counsel conceded that there was no disputed question of fact.　Such concession was fairly required by the evidence.　That question, however, requires no special consideration on this review, since by such concession and the motion for nonsuit or dismissal of the complaint, with the absence of any request for submission to the jury, the questions were treated as those of law only, and consequently the exception to the direction of the verdict is not available to support the contention that the question should have been submitted to the jury.　Winchell v. Hicks, 18 N. Y. 558; Ormes v. Dauchy, 82 N. Y. 443; Dillon v. Cockcroft, 90 N. Y. 649.

The judgment and order should be affirmed.　All concur.

---

(18 App. Div. 276.)

## MASSACHUSETTS NAT. BANK et al. v. SHINN et al.

(Supreme Court, Appellate Division, Second Department.　June 15, 1897.)

1. MINING LEASES—FIXTURES—TIMBERING IN SHAFTS.

The owner of certain land containing deposits of ore leased it to one S. for the purpose of mining.　The lease provided that the lessee should timber the shafts, and that the timbering should, at the termination of the lease, be regarded as fixtures.　It was further provided that in case of a

surrender of the lease the lessee would permit a re-entry by the lessor before the actual surrender, for the purpose of installing pumping machinery, and also that the lessor might, at the expiration of the lease, buy all mining machinery and buildings erected during the term at a price to be agreed on or fixed by appraisers, and, if he should not purchase the same, the lessee might remove them within 60 days after the termination of the lease. *Held*, that under the lease containing these provisions, though another clause provided, in connection with a covenant for renewal, for a leasing by the lessor of the premises, machinery, and appurtenances, the machinery and appliances placed on the land by the lessee did not immediately become a part of the freehold, but the lessee had rights therein which he could transfer by mortgage while in possession of the land.

2. SAME—MORTGAGE OF TIMBERING.

    *Held*, further, however, that such machinery and appliances were trade fixtures, and, upon the lessor's recovering possession of the land by summary proceedings for nonpayment of rent, before the removal of such fixtures, and without the assertion of a right to remove them by the lessee or his mortgagee, the same became the lessor's property as a part of the freehold, and the right of the mortgagee to foreclose his mortgage thereon was lost.

  Goodrich, P. J., dissenting.

Appeal from trial term, Westchester county.

Action by the Massachusetts National Bank and another against William H. Shinn, as administrator of the estate of William P. Shinn, deceased, and another. From a judgment in favor of defendant George B. Butler, rendered on the report of a referee, plaintiffs and defendant Shinn appeal. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Henry W. Hayden, for appellants.
Prescott Hall Butler, for respondent.

WILLARD BARTLETT, J. On April 20, 1892, William P. Shinn executed a chattel mortgage to the Sturtevant Mill Company of Boston, Mass., to secure the payment of six promissory notes made by him to the order of that corporation, which notes aggregated the sum of $30,000. All of these notes have been paid except one for $5,000, now held by the Massachusetts National Bank, one of the plaintiffs herein, and two for $5,000 and $3,000, respectively, now held by the plaintiff Waldemar A. Schmidt. The chattel mortgage covered two boilers, two engines, two dryers, one Sturtevant mill, one electric dynamo, one Hoagland crusher, and also all the shafting, pulleys, belting, and all tools and machinery in the factory and upon certain premises at Croton Falls, Westchester county, N. Y., leased by the said William P. Shinn from the defendant George B. Butler. The mortgage was duly filed with the town clerk of the town of Somers, in which the property was situated, on April 23, 1892, and copies thereof were filed annually thereafter until the commencement of this action. In addition to the articles already mentioned, the mortgage also embraced a pair of crushing rolls, which were described in the schedule as not yet in place. All this machinery and these appliances had been purchased from the Sturtevant Mill Company in order to carry on mining operations upon the Butler farm in Westchester county, upon which a deposit of iron ore had been discovered. On October 21, 1890, the de-

fendant George B. Butler, by an elaborate instrument of lease, granted and conveyed to one Henry E. Collins, for a term of 20 years, all the iron ore in or under a certain portion of his farm therein described, together with the exclusive right to mine the same. The lessee, among other things, covenanted and agreed to mine at least 10,000 gross tons of ore a year after June 1, 1891, and to erect such buildings, sink such shafts, make such drifts and galleries, and provide such machinery, as might be necessary to enable him to mine and ship that quantity. Collins subsequently, with the consent of Butler, assigned a two-thirds interest in this lease to William P. Shinn, who undertook to perform the covenants, conditions, and obligations contained in the instrument, and who accordingly went on and erected a mill and complete plant with appropriate machinery for carrying on the business of mining, washing, and concentrating iron ore upon the leased premises, and shipping it therefrom. This plant, comprising everything covered by the chattel mortgage except the two crushing rolls, was complete, and on the ground, before the chattel mortgage was given, on April 20, 1892. On May 5, 1892, William P. Shinn died. His representatives, however, continued mining operations under the lease, and paid the minimum royalties therein provided for until December 1, 1892. No further rent was paid, and between the 10th and 22d of June, 1893, the tenants, Collins and the representatives of William P. Shinn, were dispossessed by means of summary proceedings instituted in behalf of the landlord, Butler. The chattel mortgage was assigned to the Massachusetts National Bank, which thereupon, on October 18, 1893, brought this suit to foreclose it for its own benefit and that of Waldemar A. Schmidt, who claims to be entitled to share in its proceeds in proportion to his interest in the unpaid notes which it was given to secure. The defendant Butler resisted the foreclosure upon the ground that the mortgaged property, prior to the giving of the mortgage, had been so annexed to the freehold as to constitute a part of it, and that it became the absolute property of the landlord when he was put in possession of the premises in the summary proceeding to dispossess the tenants for the nonpayment of rent. This defense was sustained, except as to the two crushing rolls of which mention has already been made, and judgment was directed accordingly in favor of the defendant Butler.

I am unable to agree with the conclusion of the learned referee that the machinery and fixed articles of every description included in the mining plant were intended by the parties to be permanently and irrevocably attached to the land, and, unless at the option of the landlord, were to constitute a permanent addition to the freehold. As between landlord and tenant, the placing of machinery or other appliances by the tenant upon the leased premises for the purposes of trade or manufacture to be carried on by the tenant does not make the property so affixed a part of the freehold, but it still remains personalty to such an extent, at least, that the tenant retains the right to remove it. Ombony v. Jones, 19 N. Y. 234; Tifft v. Horton, 53 N. Y. 377, 382; Lewis v. Pier Co., 125 N. Y. 341, 346, 26 N. E. 301. The trade fixtures of a tenant, in other words, remain personal property in the eye of the law, so far as the right of removal is concerned. 2 Tayl.

Landl. & Ten. (8th Ed.) § 549. The correctness of this proposition is not disputed, but the referee holds that the presumption to which it would naturally give rise "in favor of the removal of these buildings and machinery erected for the purposes of trade is absolutely precluded by the terms of the lease and the subsequent transactions, all of which, taken together, show the object of the annexation, and express the intention of the parties." He concludes that this intention was to affix the entire mining plant to the land, as it should be placed thereon, absolutely, and once for all. I do not so construe the lease. At least three of its provisions seem to me to be inconsistent with this view. In the ninth article the lessee covenants to timber the shafts, main drifts, and galleries in accordance with the practice of modern mining as it exists in the United States, "which timbering shall, at the termination of this lease, or any renewal thereof, be regarded by the parties as fixtures." Why specify this timber construction as to be classed among fixtures if the entire plant was intended to be comprised in the same category? In the tenth article it is provided that, in the event of a surrender of the lease, the lessee will permit a re-entry 20 days before the actual surrender, for the purpose of enabling the lessor to install pumping machinery to keep the mines from filling with water, and make such other arrangements as may be necessary to prevent damage to the premises, or the destruction of any part thereof. This provision would hardly have been inserted if the lessor had supposed, or the lessee had intended, that the mining plant was to become the property of the landlord as fast as it was put in place, as is now contended. Finally, the nineteenth article furnishes the clearest evidence to my mind that there was no intention to take these trade fixtures out of the ordinary rule that they are to be deemed to retain their character as chattels, as between landlord and tenant. The language of this article is as follows:

"The lessee further covenants and agrees to and with the lessor that he will, if the lessor so desires, at the expiration of this lease, or of the renewal lease, if the same shall be accepted, sell to the lessor all the mining machinery, buildings, and other erections erected upon or under the said premises during the whole time that he shall have occupied the same, allowing therefor to the lessee the full valuation at which such machinery, buildings, and other erections shall be then estimated in the buildings, and not for the purposes of removal. And in case the parties hereto shall not agree upon a valuation, then the same shall be made by three disinterested persons selected as hereinafter provided. In case the lessor, at the expiration of this lease, or of the renewal lease, if the same shall be accepted, shall fail to purchase the mining machinery, buildings, and other erections referred to above, the lessee shall be at liberty to remove the same within sixty days from and after the actual termination of this lease, or the extension of the renewal lease."

It is difficult to believe that the lessee and lessor would have thus carefully specified what would be their respective rights as vendor and purchaser of the mining machinery and buildings at the termination of the original or renewal lease, if it had been their understanding that the lessor was to acquire title thereto simply by virtue of the erection of the buildings and the operation of the plant on the leased premises. Why should provision be made for the purchase by the lessor, at the end of 20 years, of property which became his, according to the claim now put forward, at or near the beginning

of that period?  It certainly is unusual for a party to enter into a covenant to buy that which he already owns.  In the third article of the lease a renewal is provided for upon at least one year's notice from the lessee to the lessor; and in this article, upon receiving such notice, "the lessor covenants and agrees that he will let and lease to the lessee all the premises, machinery, and appurtenances" thereinbefore described for a further term of 20 years.  The mention of the machinery in the clause quoted is regarded by the referee as indicating that it was intended to become the property of the lessor when placed upon the land, and it is suggested that Butler would not thus agree to lease the machinery to Collins and Shinn in the event of a renewal, unless Butler was understood to be the owner. When we refer to the nineteenth article, however, and read its provisions in connection with those of the third article concerning a renewal, it becomes plain, I think, that the agreement on the part of Butler to lease the machinery to Collins and Shinn, if the lease of the mine should be renewed, was predicated on the assumption that Butler might purchase the plant at the expiration of the original lease, as he was privileged to do by virtue of the nineteenth article, in which event the lessees would have to acquire from him the right to continue to use it in operating the mine.

For these reasons I am satisfied that the defendant George B. Butler had not become the owner of the mortgaged property at the time the chattel mortgage was given.  Shinn possessed rights in respect to it which it was competent for him to transfer by the mortgage to the Sturtevant Mill Company, and the question next to be considered is, what was the extent of those rights?  At that time there had been no default on the part of the lessees, and Shinn still had the right to cancel and surrender the lease under the fourth article thereof, which provided that the lessee might do so at any time within two years from its date, if not satisfied that the ore could be mined economically.  Hence it is argued in behalf of the plaintiffs, who have succeeded to the interest of the Sturtevant Mill Company as mortgagees, that the chattel mortgage given by Shinn at this time to secure the balance of the purchase price for the machinery was good and valid, and no subsequent default on his part could vitiate the rights of the Sturtevant Mill Company or its assignees to collect out of the proceeds of said machinery the balance due on account of the purchase price thereof.  But this argument proceeds in disregard of the proposition that the rights of the mortgagee of the tenant's trade fixtures are to be measured by the rights of the tenant himself in respect to such fixtures.  While the tenant possessed the right of removal, he was bound to exercise it, if at all, before his term expired, or within the period limited by his lease, or, at all events, before quitting possession of the real estate upon which the trade fixtures were situated.  Brooks v. Galster, 51 Barb. 196.  Where the tenant has mortgaged such trade fixtures, after placing them upon the leased land, and fails to remove them within the term, or the period prescribed by his lease, or while he retains possession of the land upon which they are located, his title becomes subordinate to that of the lessor, and his right of removal is lost.  Talbot v. Whipple,

14 Allen, 177, 182. This point was directly involved and expressly decided in the case cited, where the court says:

"It is hardly necessary to add that the plaintiffs can claim no better title to the property in controversy than that which was vested in the tenant under whom they claim as mortgagees. When the mortgage was made, the building and machine were fixtures annexed to the realty of the defendant by his tenant, and which the defendant then had the inchoate right to claim as part of the freehold, if not seasonably disannexed before the term was ended."

So in the case at bar, at the time the chattel mortgage was made, and ever since, the defendant Butler had and has had the inchoate right to claim the mortgaged fixtures as part of the freehold if not seasonably disannexed. The mortgagee acquired the right to detach and remove them under the same circumstances as would have warranted their detachment and removal by the mortgagor. But neither the mortgagee nor its assignees ever sought or attempted their removal, until subsequent to a time when all right of removal on the part of the lessee or his representatives had absolutely ceased and determined. The suit to foreclose the mortgage was not commenced until nearly four months after the summary proceedings had put the landlord in possession of the leased premises to which the trade fixtures were attached. At this time, in any view of the case, the tenant's right to remove them had terminated, and the mortgagee could enforce no other or better right. There is nothing adverse to this view in Lewis v. Pier Co., supra, which the appellant cites in support of his proposition that a landlord cannot destroy the tenant's right to remove trade fixtures by dispossessing the tenant for non-payment of rent. In that case the tenant who held over after the expiration of his lease claimed the right to remove his building at the time of his ejection by virtue of the summary proceedings, but was not permitted to remove it. His claim was seasonably made, while still in possession of the leased premises upon which the building stood. In this respect the case seems clearly distinguishable in principle from the case at bar, where the term of the tenant ended by reason of his default in the payment of the rent, and where he was also deprived of the possession of the leased premises without any claim being made on his behalf or that of his mortgagees that they were entitled to remove the machinery in question, or even desired to do so. As Mr. Taylor says: "The tenant's right to remove is rather considered a privilege allowed him than an absolute right to the things themselves. If he does not exercise the privilege before his interest expires, he cannot do it afterwards, because the right to possess the land and the fixtures as part of the realty vests immediately in the landlord." 2 Tayl. Landl. & Ten. (8th Ed.) § 551. His mortgagee, as already suggested, must act with equal promptitude.

It seems to me, therefore, that the referee was right in his conclusion that the mortgage in suit could not be enforced except as against the two crushing rolls, which had not become fixtures at the time when the mortgage was given, and I think the judgment entered upon his report should be affirmed. All concur, except GOODRICH, P. J., dissenting.

GOODRICH, P. J. (dissenting). I concur with Mr. Justice BART-LETT in his conclusion that the machinery and fixed articles included in the mining plant were not intended by the parties to be permanently and irrevocably attached to the land at the option of the landlord, and that they did not constitute a permanent addition to the freehold, but by the terms of the lease were intended to remain personal property; and that the lessor had not become the owner of the mortgaged property at the time the chattel mortgage was given. Starting with this conclusion, I proceed to discuss the rights of the lessee and his assignee, the plaintiff. It should be borne in mind that the mortgage was given to secure the purchase money of the articles, although there is no evidence that there was any agreement at the time of the purchase that any such mortgage should be given. Still this fact, in a certain sense, appeals to the equitable power of the court to protect an innocent person who has parted with his property without payment, where another person who has parted with no value seeks to enforce a forfeiture, and to claim as his own a large and valuable property, costing more than $70,000, because the lessee has not paid rent amounting to $2,500; for the right which the lessor claims is in the nature of a forfeiture. It was so held in the case of Estabrook v. Hughes (Neb.) 1 N. W. 132, where, a tenant being in default for nonpayment of rent, the landlord sought to restrain him from removing the improvements, in accordance with the provision of the lease, and the court refused to enforce a forfeiture. It must be remembered that before all of the property had been delivered—viz. the two crushing rollers—the mortgage was executed, and it included the rollers. This mortgage was duly filed on April 23, 1893, and it is at this date that the rights of the mortgagee became crystallized. If the title to this property at that time had vested in the lessor by the terms of the mining lease, the lessee had no right to execute a mortgage except in subordination to the rights of the lessor, and there would be no question that the entire decision of the referee was correct. If, on the other hand, the title to the property was in the lessee, it passed from him to the mortgagee, and his rights cannot be affected by any subsequent action or sufferance of the lessee. The filing of the chattel mortgage gave notice to the lessor that the mortgage had been made, and he was bound to know its effect, and all his subsequent proceedings are colored with that knowledge. That effect was to transfer the title to the mortgagee, subject only to defeasance upon the payment of the notes to secure which it was given. Hall v. Sampson, 35 N. Y. 274. When default occurred in the payment of the notes, the title in the mortgagee became absolute, subject only to the right of the mortgagor to bring his action in equity to redeem upon payment of notes, interest, and expenses, but otherwise the rights of the mortgagee had become fixed, and he was the absolute and legal owner of the property; the title of the mortgagor was extinguished. Tender after forfeiture does not revest the title in the mortgagor at law, nor is acceptance of part of the debt a waiver of the forfeiture. Patchin v. Pierce, 12 Wend. 61. The mortgagor cannot give a second mortgage. He has no title to mortgage. Hulsen v. Walter, 34 How. Prac. 385. This principle is elementary, and hardly needs citation of authority,

although the perfection and strength of the mortgagee's title on de-
fault is illustrated by the case of Leadbetter v. Leadbetter, 125 N. Y.
290, 26 N. E. 265, where Judge O'Brien, writing the opinion, said:

"The law seems to be settled in this state that after default the mortgagor
has no interest in the mortgaged property that can be sold on execution against
him [citing authorities]. The event had happened which made the mortgage
instantly due, and there was no right of possession in the mortgagor when the
levy was made."

Of course, it goes without saying that the mortgagee could acquire
no greater rights than the lessee had or could convey, but, whatever
these rights were, he acquired them, and this at the time of the default.
At this time the lessee was the owner of the property which, as Mr. Jus-
tice BARTLETT holds, was then personalty, and not realty, and the
lessor had no title whatever thereto, and no right of possession. His
rent had been paid, not only up to that time, but it continued to be
paid for nearly a year afterwards. The landlord could not have taken
possession of the property during the year, for he was not the owner
of it, and there was no default in the payment of rent for which sum-
mary proceedings to dispossess could be instituted. Discount Co. v.
Drake, 6 C. B. (N. S.) 798, decided in 1859, is a leading case upon the
question, and settles it conclusively. One Robinson, a tenant of an
eating house under a lease which had seven years to run, on Septem-
ber 4, 1857, borrowed money of the plaintiff, and gave it by way of
collateral security a bill of sale upon his furniture and effects upon the
premises, including certain tenant's fixtures. This bill of sale was
clearly equivalent to a chattel mortgage. On March 8, 1858, Robin-
son had given his landlord an authority to distrain the fixtures, and
on April 5th he made a formal surrender of the term to him, where-
upon a fresh lease was given by the landlord to the defendant Drake,
the tenant's fixtures in question still remaining upon the premises un-
severed from the freehold. On March 30th the plaintiff entered the
premises for the purpose of taking possession of the property. The
court directed a verdict for the defendant, which was reversed on ap-
peal in an opinion carefully reviewing all the authorities upon the
subject, and using the following language:

"It is fully established that the right of the lessee to remove fixtures con-
tinues only during the term, and during such further period of possession by
him as he holds under a right still to consider himself as tenant; and it is plain
that the right of his assignee can extend no further. On the other hand, it is
laid down, as to a surrender, in Co. Litt. 338b, that, 'having regard to strangers
who were not parties or privies thereto (lest by a voluntary surrender they may
receive prejudice touching any right or interest they had before the surrender),
the estate surrendered hath, in consideration of law, a continuance.' This doc-
trine has been fully adopted and acted on in modern cases," etc.,—citing cases.
"The question is thus reduced to the inquiry whether the mortgagee's right to
sever the fixtures from the freehold is a 'right or interest,' within the meaning
of this rule of law. And we are of opinion that it is. Certainly it is an inter-
est of a peculiar nature, in many respects rather partaking of the character of
a chattel than of an interest in real estate. But we think that it is so far con-
nected with the land that it may be considered a right or interest in it, which,
if the tenant grants away, he shall not be allowed to defeat his grant by a sub-
sequent voluntary act of surrender. We are therefore of opinion that the plain-
tiffs may maintain an action against the defendant for preventing them from
exercising their right to sever, and may in such action recover the value of the
fixtures as severed."

This case was cited and approved by the court of exchequer in the case of Saint v. Pilley, L. R. 10 Exch. 137, where fixtures belonging to an insolvent lessee were sold at auction to the plaintiff, to be removed by him in two days from the sale, but he allowed them to remain while treating with the landlord for a new lease. His attempt failing, the insolvent's representative surrendered the premises to the landlord, who relet them, the fixtures remaining affixed. About two weeks afterwards the plaintiff applied for and was refused the fixtures, and the court held that he had not lost his right by delay or laches. Cleasby, B., said:

"It is quite plain that the surrender did not forfeit the right which the vendee of the property had acquired. The general maxim is laid down in Co. Litt. 338b: 'Having regard to the parties to the surrender, the estate is absolutely drowned.' * * * Therefore, though the term was surrendered, yet the plaintiff's right was not affected. The defendant came into possession with chattels upon the land, which were subject to the rights of a third person."

There remains a single question: Whether, if the lessee cannot, by surrender of the term, defeat the rights of his mortgagee, he can, by nonpayment of rent, and consequent summary proceedings to dispossess, destroy the property rights conveyed by the mortgage. I can see no distinction. The reasoning of Williams, J., in Discount Co. v. Drake, supra, is based upon the theory that the lessee had transferred his interest in the property. So, manifestly, in the present case, the plaintiff being absolute owner of the property, no subsequent action of the lessor or lessee can defeat his rights; neither laches, nor contract, nor delay, nor summary proceedings to dispossess under the provisions of the lease. The lessor is met by a new title owner, and his right to dispossess can be contested, not only by the original lessee, but by his mortgagee, who had succeeded to his rights as they existed at that time. If it be said that the rights of the lessor are derived from the lease, and that the lease is paramount to the rights acquired subsequently by the mortgagee, and that, while the tenant may remove the property during his term, he cannot do so after his term, there seem to be two answers to the proposition: First. The lease was entitled to be and was recorded as of real estate. It was not filed as a contract relating to chattels. It conveyed no interest in the chattels, for such Mr. Justice BARTLETT concludes them to be. There was, therefore, no constructive notice of the existence of the lease to the mortgagee, and no actual notice is shown in the evidence, although I do not mean to intimate that notice would make any difference in the rights of the plaintiff. Second. The paramount rights of the lessor relate only to the lessee, and not to a stranger who has acquired a good title under him while he had a right to convey. Such seems to me to be the decision in the cases of Doe v. Pyke, 5 Maule & S. 146, Pleasant v. Denson, 14 East, 234, and Pike v. Eyre, 4 Man. & R. 661, which were cases where tenants in possession made subleases of portions of the demised estates, and these were held good, even though the original lessees subsequently surrendered their own leases to the landlords. The right of the landlord under his grant in these cases would seem to have been equally paramount, yet the right was held not to be para-

mount to the right of a stranger taking under the lessee. The landlord in the present case has only such rights as the lease gave him, and these are subject to defeat by a contract of the lessee. How, then, can it be said that the right to institute summary proceedings to dispossess, which arises under the terms of the lease and by the failure of the lessee to pay rent, can defeat an estate g nted while he had the lawful right to grant? Mr. Justice BARTLETT, in his opinion, treats the lease as clearly evidencing an intent on the part of both lessor and lessee to consider the property in question as personal property between themselves, and that they could thus agree is not to be questioned. Assuming this to be the case,—and there seems to be no doubt of it,—why resort to the theory of "trade fixtures"? That theory is universally relied upon where there is no agreement that the property shall be personal property, and it would seem wholly unnecessary to turn to it where there is a clear understanding between the parties that the articles shall be personal property. If the parties had made no stipulation as to the nature of the goods in question, or had stipulated that they should be regarded as "trade fixtures," the case might well be different. Having been careful not to do this, it would seem that the engines, boilers, and machinery must be treated as mere chattels, which could not, while the agreement subsisted, become real property against the will of either party to the agreement. Besides, it seems clear that the lessor is estopped by that agreement to deny the personal nature of the articles as against the mortgagee, who has the right to rely upon the agreement. Summary proceedings to dispossess are of modern statutory origin, but the ancient remedy of distress for rent was in a sense its equivalent. For this reason the case of Discount Co. v. Drake, supra, seems to be exact authority for saying that as the lawful process of distress for rent could not work a forfeiture of the rights of a mortgagee acquired while the tenant was in possession, no more can the statutory process for dispossession. The one was the result of the operation of a lawful power; so is the other. Both grow out of the lease, and what may be affirmed of power to affect the rights of a mortgagee under the one process may be equally affirmed of the other. The summary proceedings to dispossess occurred in June, 1893, and the plaintiff had no notice of them until September 16th, when he immediately demanded the property, and, his demand being refused, the lessor became chargeable with conversion of the property, of which the plaintiff was the absolute owner. The learned referee admitted in evidence the summary proceedings to dispossess, under the objection and exception of the plaintiff, and, in my opinion, this was reversible error, as the judgment in that proceeding was inter alios, and not binding upon the plaintiff.

The case of Talbot v. Whipple, 14 Allen, 177, does not seem to be opposed to my general conclusion. The mortgage was apparently a mortgage of real property, and there was no agreement that the property—a building containing machinery for manufacturing purposes—should be regarded as personal property. Upon these facts the court held that there could be no doubt that the building and

machine were not to be regarded as movable chattels such as the tenant might have removed after the expiration of his tenancy, but as belonging to that class which, if removable at all, must be removed by the tenant from the realty during the term, or, if suffered to remain till the expiration of the tenancy, belong to the landlord as a part of the freehold. But in the case at bar the conclusion of my learned associate is clear that there was no intention of the parties to the lease that the property should become a part of the realty, and did not so become even by the subsequent omission of the lessee to pay his rent; thus bringing the property, apparently, within the class mentioned in Talbot v. Whipple, supra, of "movable chattels, such as the tenant might have removed within a reasonable time after the expiration of the tenancy." Before there was any such omission to pay rent, the rights of the plaintiff had supervened, and these cannot be defeated without his active assent, or by notice to him which will give him his day in court. A different rule prevails between the lessor and lessee when there is no mortgage. There the right of the lessee to remove during his tenancy is a privilege which he may forfeit by delay, but that does not affect the right of a mortgagee, who stands in a very different relation. True, he has the right to remove the goods to which he has title on the default of the mortgagor, but he may also leave the property on the premises with the assent of the mortgagor, and his leaving it there cannot affect his rights, as there is no principle of estoppel in favor of the lessor. It is undoubtedly true that where a tenant suffers default in payment of rent, and is dispossessed, he loses his right to remove certain articles, on the ground that they are to be deemed fixtures; but this right of removal is a personal privilege, and its loss a personal one, and the results of his failure to remove cannot be extended to destroy the rights of a third person whose rights are in no sense dependent on a personal privilege. Section 571 of the Penal Code makes it a misdemeanor for a mortgagor to "sell, assign, exchange, secrete, or otherwise dispose of" the mortgaged property. While lying by and suffering dispossession proceedings would not be within this section, the existence of such a provision shows how carefully the law regards the rights acquired by a mortgagee. To work out the logical result of Mr. Justice BARTLETT'S opinion, we must hold that, if the lessee simply quits possession without removing his fixtures, the title thereto vests in the lessor. 2 Tayl. Landl. & Ten. § 553. Then, if a mortgage exist, even though it be a mortgage for purchase money, the mortgagor can defeat the rights of the mortgagee by simply quitting possession, or by selling out to the lessor, in spite of section 571 of the Penal Code. I cannot assent to any such proposition, and I think the judgment should be reversed.